1

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF WASHINGTON
 2

 3   UNITED STATES OF AMERICA,      )
                                    )      Nos. 11-CR-057-RHW-1
 4             Plaintiff,           )           11-CR-057-RHW-2
                                    )      October 2, 2012
 5   vs.                            )      Spokane, Washington
                                    )
 6   J. SCOTT VRIELING and          )
     PATRICIA DIONN VRIELING,       )      Transcript of:
 7                                  )      Testimony of Heather Burns
               Defendants.          )
 8   _____)

 9
                   BEFORE THE HONORABLE ROBERT H. WHALEY
10                 SENIOR UNITED STATES DISTRICT JUDGE

11
     APPEARANCES:
12
     For the Plaintiff:            George J.C. Jacobs, III
13                                 Assistant United States Attorney
                                   P.O. Box 1494
14                                 Spokane, WA  99210-1494

15

16   For the Defendant            J. Scott Vrieling, Pro Se
     J. Scott Vrieling:           2437 West Shore Drive
17                                Moses Lake, WA  98837

18   For the Defendant            Patricia Dionn Vrieling, Pro Se
     Patricia Dionn Vrieling:     2437 West Shore Drive
19                                Moses Lake, WA  98837

20

21
     Official Court Reporter:     Debra Kinney Clark, RPR, CSR
22                                United States District Courthouse
                                  P.O. Box 700
23                                Spokane, WA 99210
                                  (509) 458-3433
24
     Proceedings reported by mechanical stenography; transcript
25   produced by computer-aided transcription.
```

1                          WITNESS INDEX

2    ON BEHALF OF THE PLAINTIFF:                              PAGE

3        HEATHER BURNS:

4            Direct Examination by Mr. Jacobs . . . . . . . .    3
             Cross-Examination by Ms. Vrieling  . . . . . . .   19
5

6

7                          EXHIBIT INDEX

8    NO.        DESCRIPTION                                  ADMTD

9    1-38C      LifeWise Checks                                 14

10   1-38D      Premera Blue Cross Checks                       10

11    58        Commission Agreements                           15

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (The witness's picture was taken.)

2            THE COURTROOM DEPUTY:  Please raise your right hand.

3    (WITNESS, HEATHER BURNS, called as a witness on behalf of the

4    plaintiff, having first been duly sworn, testified as follows:)

5            THE COURTROOM DEPUTY:  Okay.  Would you please have a

6    seat?  Would you please state your name; and spell your first

7    and your last name for the record, please.

8            THE WITNESS:  Heather Burns.  H-e-a-t-h-e-r.  Burns,

9    B-u-r-n-s.

10            MR. JACOBS:  Your Honor, we're moving a little bit

11    faster than we thought this morning.  We have to -- we're going

12    down to get the exhibits.  We've got copies of the exhibits,

13    so -- but I think I can -- I can start, Your Honor.

14            THE COURT:  All right.  Go ahead.

15                        DIRECT EXAMINATION

16    BY MR. JACOBS:

17    Q    Ma'am, could you state your full name and spell your last

18    name for the benefit of the court reporter?

19        Oh, she's already -- I'm sorry.  Okay.  I missed that.

20        Ma'am, could you tell the members of the jury where you're

21    employed?

22    A    I work for Premera Blue Cross in Mountlake Terrace,

23    Washington.

24    Q    Please tell the jury how long you've been employed at

25    Premera Blue Cross.

1   A      Twenty-plus years.

2   Q      Ms. Burns, can you tell the jury what -- what are your

3   responsibilities at the company?

4   A      I work with the producer agent, slash, broker contracting;

5   and I work in -- with the commissions on the medical side of our

6   company.

7   Q      Is there a particular department you're in?

8   A      It's called sales operations.

9   Q      Could you tell the jury what your company does?  What type

10  of business is it involved in?

11  A      Premera Blue Cross sells insurance products to groups and

12  individuals for health care.  Health care services.

13  Q      Ms. Burns, could you tell the jury -- Premera Blue Cross --

14  are there -- does it have any affiliates; for example, LifeWise

15  or the like?

16  A      Premera Blue Cross has LifeWise Health Plan, a Washington

17  brand, which sells also individual health plans in the state.

18  It has a LifeWise Assurance Company, which sells a life and

19  disability product.  And then the Premera Blue Cross sells

20  medical products too for group and individual.

21  Q      Ma'am, did you mention a LifeWise Assurance Company and

22  LifeWise Health?

23  A      Yes, I did.

24  Q      All right.  And then Premera Blue Cross -- is -- is there

25  an umbrella company?

1  A    Premera is the umbrella corporation that owns Premera Blue

2  Cross, LifeWise Health Plan in Washington, LifeWise Assurance

3  Company.  And then we have various subsidiaries in different

4  states.

5  Q    Ms. Burns, you had mentioned a few moments ago something

6  about -- I think you said a producer or a broker or something.

7  What -- could you explain those terms?  Are those terms used in

8  your industry?

9  A    Right.  Most of you are probably aware of an insurance

10  agent and/or a broker.  In the state of Washington, they're now

11  called producers.  So, the term broker, agent, producer all mean

12  the same thing.  It's a person that solicits insurance for a

13  carrier, gets paid a fee to do that.

14  Q    Mrs. Burns, just so the jury's clear, in order for Premera

15  Blue Cross and these other affiliates that you mentioned to sell

16  their products, do they use an agent or a broker or a producer?

17  A    About 80 percent of our business is sold through an

18  agent/producer relationship.  The remainder is sold direct.

19  Q    During the time period of 2003 to 2007, Mrs. Burns, could

20  you tell the jurors -- was Mr. Vrieling, Jon Scott Vrieling --

21  did he have a business relationship with your company?

22  A    Yes.  He was one of our affiliated producers, agencies, to

23  sell our products.

24  Q    Could you tell the jury -- in order to be a producer or a

25  broker to sell your products during that time period, is it

1  required that the broker or agent be licensed in the state of

2  Washington?

3  A    They need to be licensed in the state of Washington and be

4  contracted with each of our carriers that they represent, which

5  means that we have an internal corporate contract that each of

6  them signs.

7  Q    And so did Mr. Vrieling sign a contract with your company

8  to solicit business for your company?

9  A    Yes, he did.

10 Q    Could you tell the members of the jury -- during the time

11 period 2003 to 2007, did Mr. Vrieling receive any compensation

12 from your company or the affiliates that you mentioned?

13 A    Yes.

14 Q    Could you tell the jury -- were those -- how is that

15 compensation paid?

16 A    On a monthly basis.  We calculate the compensation; and we

17 mail out a statement as to how it was calculated, the various

18 detail of it, with a check.

19 Q    Okay.  And --

20      MR. JACOBS:  Just one moment.  I'm going to -- Your

21 Honor, we're just waiting on a binder, which is being brought

22 anon.

23 Q    (By Mr. Jacobs)  Ma'am, we're about to hand you a binder.

24 But have you had an opportunity -- I'm going to be showing you

25 some checks that are in that binder.  Have you had an

1   opportunity to review those checks prior to testifying today?

2   A    Yes.

3   Q    Could you tell the jury -- were those checks that your

4   company or one of the affiliates issued to Jon Scott Vrieling or

5   Vrieling Financial during the period 2003 to 2007?

6   A    Yes.

7   Q    Could you tell the jury what -- why your company issued

8   those checks?

9   A    They were payment for his services for soliciting the

10  business that -- that we sold.  He sold to the clients.  We paid

11  him a commission to do that.

12  Q    Okay.  You paid a what?

13  A    "Commission" is what it's called --

14  Q    All right.

15  A    -- in the industry.

16         MR. JACOBS:  May I approach, Your Honor?

17         THE COURT:  Ms. Robinson?

18       (Materials were handed to the witness.)

19  Q    (By Mr. Jacobs)  Ma'am, you've got in front of you what's

20  been marked for identification as Government's Exhibit 1-38D, as

21  in David.  And if you look at that binder, it's a composite

22  exhibit.  Could you go -- there are a series of tabs.  Could you

23  go to the tab that's got Premera Blue Cross?  Go to that tab.

24  And then do you see a series of checks?  Are those the checks

25  that you reviewed that Premera Blue Cross issued to Mr. Vrieling

1  or Vrieling Financial during the period 2003 to 2007?

2  A    Yes.

3  Q    Okay.  And the purpose of those checks -- were they

4  reimbursement, or were they compensation for services rendered?

5  A    They were compensation for services, for selling the

6  business.

7  Q    Okay.  And those are copies of the checks.  Is that

8  correct?

9  A    Correct.

10 Q    Okay.  And, ma'am, if you could, the checks that you've got

11 in front of you from Premera Blue -- or -- payments by Premera

12 Blue Cross, are they arranged chronologically from 2003 to 2007?

13 A    Yes.

14        MR. JACOBS:  Your Honor, I'd move to admit those

15 checks into evidence, Your Honor.

16        DEFENDANT PATRICIA DIONN VRIELING:  I would object.  I

17 don't -- can I -- I don't know what to do.  I do have a reason

18 for objecting.

19        THE COURT:  I couldn't hear you.

20        DEFENDANT PATRICIA DIONN VRIELING:  I do have a reason

21 for objecting.

22        THE COURT:  All right.  Well, you go ahead and state

23 it.

24        DEFENDANT PATRICIA DIONN VRIELING:  Your Honor, the

25 Internal Revenue Service and Mr. Jacobs have violated the Powell

1  (phonetic) doctrine extensively over the last 15 years in our

2  lives by ransacking our -- our bank accounts, by ransacking our

3  commission statements.  Every piece of information that is in

4  that book was presented in the form of a simple piece of paper

5  called a 1099 form that was sent to the Internal Revenue

6  Service, that was sent to us.  The Internal Revenue Service had

7  the ability to -- to examine those documents.  I'm more positive

8  that when I ask Mrs. Burns whether there's a difference in the

9  amount of checks and the amount that was shown on that 1099

10 form, there is going to be no difference.

11      So we're getting this circus of paperwork and a violation

12 of our privacy for him to prove numbers that we're not

13 disputing.  There is no dispute.  He's going to bring in 20

14 witnesses or something like that for -- from insurance agencies

15 that we have no dispute with.  We're wasting time.  We're

16 wasting the public's time.  We're -- we're being violated and

17 have been raped in all of our privacies -- every bank account,

18 every relationship that we have with our business.

19      With Premera -- Premera blue Cross -- we've had an

20 extensive relationship with them.  We've been on their advisory

21 councils.  We have a good relationship.  And these people are

22 violating that in an attempt to make a circus act for the

23 benefit of the jury that has no -- no value.  They have that

24 amount.  We can show you that they can run a report that shows

25 every income from every source in one piece of paper.  And this

1  is ridiculous.

2          THE COURT:  Were these checks one of those things that

3  you had a certification for?

4          MR. JACOBS:  Yes, Your Honor.

5          THE COURT:  They're admitted over objection.

6          THE COURTROOM DEPUTY:  Your Honor, just to clarify,

7  which -- what exhibit is it?

8          THE COURT:  1-38D and the Premera Blue Cross checks.

9          THE COURTROOM DEPUTY:  Okay.  Thank you.

10         THE COURT:  I'll take up the issue that you discussed

11 about agreeing to things outside the presence of the jury when

12 this witness is through.

13 Q    (By Mr. Jacobs)  Ms. Burns --

14         MR. JACOBS:  One moment, Your Honor.

15         THE COURT:  Okay.

16 Q    (By Mr. Jacobs)  And, ma'am, just so the jury is clear,

17 there are a series of checks, Premera Blue Cross checks, in that

18 binder that have an asterisk next to them.  Is that correct?

19 A    Correct.

20 Q    All right.  And those are the Premera Blue Cross checks

21 you're talking about.  Correct?

22 A    Right.

23 Q    All right.  If we could, just maybe as an example here, if

24 you could go -- if you look at the lower right-hand corner of

25 the document, there's a number 2 down at the bottom.  Can you go

1   to that page?  And there's an asterisk on the check.  Do you see

2   that, ma'am?

3           MR. JACOBS:  Permission to publish, Your Honor?

4           THE COURT:  Yes.

5       Can the jury see something on their screen?

6       (Affirmative responses from the jury.)

7           THE COURT:  Okay.

8   Q   (By Mr. Jacobs)  All right.  Is that an example of one of

9   the checks you're talking about?

10  A   Correct.

11  Q   And if you could, ma'am, could you tell the jury -- what

12  was the amount of that check?

13  A   $18,093.30.

14  Q   All right.  And are you referring to that amount that I've

15  just circled on the monitor?

16  A   Yes.

17  Q   All right.  And that amount relates to the check above it.

18  Is that correct, ma'am?

19  A   Correct.

20  Q   Okay.  And then, ma'am, if you could -- do you see what

21  I've circled there on the monitor?

22  A   Yes.

23  Q   And I'll zoom in, if that will help.

24  A   I'm okay on here.

25  Q   That's a check made payable to Vrieling Financial.  And

1  what is the address there, if you can read it?

2  A     110 East Broadway, Suite 1, Moses Lake.

3  Q     Okay.  All right.  You can put that one aside.

4        Ma'am, do you have a -- in that binder, is there a tab that

5  is marked LifeWise Health Plan in 1-38D, as in David?

6            MR. JACOBS:  Your Honor, may I -- I've got another

7  binder to show Ms. Burns.

8            THE COURT:  Ms. Robinson?

9            THE CLERK:  Do you want this binder back, or do you

10  want to --

11            MR. JACOBS:  She can keep it.

12       (Materials were handed to the witness.)

13  A     The second binder has a tab called LifeWise.

14  Q     (By Mr. Jacobs)  Okay.  And is that the 1-38C, as in

15  Charlie?

16  A     Yes.

17  Q     And in that -- in that binder, there's a tab called

18  LifeWise.  And then are there a series of checks following that

19  tab that have asterisks next to them?

20  A     Yes.

21  Q     Have you reviewed those checks prior to testifying today?

22  A     Yes.

23  Q     Do you recog -- are those -- can you tell the jury what

24  those are?

25  A     There's two types of LifeWise checks in this tab.  One are

1  LifeWise Health Plan of Washington.

2  Q    Yes, ma'am.

3  A    And some of them are LifeWise Assurance Company.

4  Q    All right.  And are you familiar with both sets of checks

5  or just the LifeWise Health Plan?

6  A    I'm mainly familiar with LifeWise Health Plan.

7  Q    All right.  Have you had a --

8  A    I recognize the others, but I'm not --

9  Q    Okay.  Regarding the LifeWise Health Plan checks, do you

10 recognize those?

11 A    Yes.

12 Q    And could you tell the jury why LifeWise Health Plan issued

13 those checks?

14 A    They are commission checks, same as the Blue Cross, for

15 selling individual plans in the state of Washington.

16 Q    And were those checks issued during the time period 2003 to

17 2007?

18 A    Yes.

19 Q    And could you tell the jury who those checks were issued

20 to?

21 A    Vrieling Financial.

22 Q    All right.  All right, ma'am.  You can put that --

23         MR. JACOBS:  Your Honor, I'd move for the admission of

24 the LifeWise Health Plan checks that are in 1-38C at this -- at

25 this time.

1          THE COURT:  Same objection you made earlier?

2          DEFENDANT PATRICIA DIONN VRIELING:  Same objection,

3   Your Honor.

4          THE COURT:  Okay.  It's overruled.  It will be

5   admitted.

6   Q    (By Mr. Jacobs)  All right, ma'am.  You can put that -- and

7   could you tell the jury -- were those checks issued on a monthly

8   basis?

9          THE COURT:  Mr. Jacobs, are all these exhibits ones

10  that were handled in the certification process earlier?

11         MR. JACOBS:  Yes, they were, Your Honor.

12         THE COURT:  All right.  It's admitted.

13  Q    (By Mr. Jacobs)  Ms. Burns, were those checks issued on a

14  monthly basis?

15  A    Most of these checks are monthly commission checks.  There

16  are some in here that are issued quarterly as bonus payments in

17  addition to commission.  So they are issued quarterly.

18  Q    Okay.

19         MR. JACOBS:  Your Honor, Government's Exhibit 58 --

20  may I approach, Your Honor?

21     (Materials were handed to the witness.)

22  Q    (By Mr. Jacobs)  Ma'am, have you had an opportunity to

23  review Government's 58 prior to testifying today?

24  A    Yes.

25  Q    And that's a --

1          MR. JACOBS:  Your Honor, I would move --

2  Q    (By Mr. Jacobs)  Is that a document between your company

3  and Vrieling Financial?

4  A    There's actually three in here.  But they are from

5  different -- under the umbrella between --

6  Q    I'll rephrase the question.

7       Are those commission agreements between the companies that

8  you're affiliated with or work for and Vrieling Financial?

9  A    Yes.

10 Q    Okay.

11         MR. JACOBS:  Your Honor, I would move for the

12 admission of those commission agreements, Government's

13 Exhibit 58.

14         DEFENDANT PATRICIA DIONN VRIELING:  We disagree with

15 this whole process, Your Honor.  Object.

16         THE COURT:  You disagree with the whole process?

17         DEFENDANT PATRICIA DIONN VRIELING:  Uh-huh.

18         THE COURT:  Okay.  They're admitted.

19         MR. JACOBS:  Permission to publish, Your Honor?

20         THE COURT:  All right.

21 Q    (By Mr. Jacobs)  Just -- we'll take a look at the first

22 page of 58.  Ma'am, that's between HealthPlus and Vrieling

23 Financial.  Is that correct?

24 A    Correct.

25 Q    And under the terms of that agreement, Mr. Vrieling agrees

1    to do business as an independent contractor.  Is that correct?

2    A    Correct.

3    Q    Could you tell the difference -- what is an independent

4    contractor versus an employee?  Do you know?

5    A    An independent contractor is paid for services that he

6    provides us, it's not guaranteed employment, and it's generally

7    a 1099 situation and not a W-2 situation.

8    Q    Okay.  And, ma'am, if you could, looking at the last page

9    of that agreement, is there a signature on behalf of the -- of

10   the agent?

11   A    Yes.  J. Scott Vrieling signed it as owner agent.

12   Q    Okay.  And then going to the next document in there, that's

13   a commission agreement between Blue Cross of Washington and

14   Alaska and Vrieling Financial.  Is that correct?

15   A    Correct.

16   Q    And turning to the last page of that document, did

17   Mr. Vrieling sign that as well on behalf of -- as owner agent?

18   A    Correct.

19   Q    And then the next document is an agency agreement between

20   Blue Cross -- is that correct?

21   A    Correct.

22   Q    And Mr. Vrieling?

23   A    Yes.

24   Q    And if you could, it's -- at least on the copy that I've

25   got, it's hard to see.  But there's a vendor number.  Up in the

1  upper right-hand corner, it says vendor number 5436.  Is that

2  the vendor number for Vrieling Financial?

3  A    Yes, it is.

4  Q    Okay.

5        MR. JACOBS:  One moment, Your Honor.  And, Your Honor,

6  if I didn't, I do move for the admission of government's 58 into

7  evidence.

8        THE COURTROOM DEPUTY:  You already did.

9        MR. JACOBS:  I did move?  Okay.  Thank you.

10       THE COURT:  It's been admitted.

11  Q   (By Mr. Jacobs)  And, ma'am, just -- I want to clarify

12  one -- one thing.  In the -- the checks that I've shown you

13  earlier, there were -- there was a check for $81 -- two checks

14  for $81.  Is that correct?

15  A    Correct.

16  Q    And $89.10?

17  A    Correct.

18  Q    And then there was a check for $250 and one for $177.54.

19  Is that correct?

20  A    Correct.

21  Q    There was a check for $97.90 that Premera Blue Cross issued

22  to Mr. Vrieling?

23  A    Correct.

24  Q    And with just the exception of those checks that I just

25  mentioned -- do you have the check numbers?

1  A     Yeah.

2  Q     Okay.  Could you give the check numbers?  Read those into

3  the record, please.

4  A     The $81 is 15333.  Another $81 was 21148.  $89.10 is 45391.

5  $250 is 59457.  $177.54 is 79007.  And $97 is 83110.

6  Q     All right.  With the exception of those checks, all those

7  other commission checks were commission payments.  Is that

8  correct?

9  A     Correct.

10 Q     All right.  And if you could -- Premera Blue Cross -- the

11 commission checks -- there's -- is it designated by a 2 or a

12 number 5 or something -- the check?  Could you explain that for

13 the jury?

14 A     Some of them are recent checks.  The check numbering series

15 starts with a 2 if it's Blue Cross and an 8 if it's LifeWise

16 Health Plan of Washington.

17 Q     All right.  And how about a 5?

18         THE COURT REPORTER:  Just a minute.  Would you repeat

19 your answer?

20         THE WITNESS:  In the more recent checks, they start --

21 the check numbering series starts with a 2 for Premera Blue

22 Cross; and it starts with an 8 for LifeWise Health Plan of

23 Washington.

24 Q     (By Mr. Jacobs)  And then how about the number 5, if a

25 check starts with a number 5?

1  A    The 5 series, which is the older checks, were issued

2  through our -- we've changed operating systems.  So the 5 were

3  issued out of our -- the different operating system.  That would

4  indicate it was a commission payment.

5  Q   Yes, ma'am.  And if you could, ma'am, in order for Premera

6  Blue Cross and these other companies that you mentioned a few

7  moments ago -- in order for those companies, during the time

8  period 2003 to 2007, to issue commission checks to Mr. Vrieling,

9  did the company require Mr. Vrieling to provide a Social

10 Security number or a taxpayer identification number or something

11 like that?

12 A    Yes.  We don't do business with anyone that doesn't provide

13 one or the other.  So yes.  It's required.

14 Q    All right.  And if Mr. Vrieling had not provided that

15 information to your company, would he have been paid

16 commissions?

17 A    No.  He wouldn't have been contracted by us to do business

18 with us, or paid.

19         MR. JACOBS:  No further questions of Ms. Burns, Your

20 Honor.

21         THE COURT:  Do you have any questions?

22                    CROSS-EXAMINATION

23 BY MS. VRIELING:

24 Q    Heather, thank you for being here.  I'm sorry for all of

25 your troubles.

1      My question to you today is:  For all of those troubles,

2  did we come to any new conclusions?  Was there anything

3  different from the 1099s that you sent to us in the past?

4  Was -- were there different amounts.  Or was everything the

5  same?

6  A    I believe it all balanced.

7  Q    Yeah.

8          DEFENDANT PATRICIA DIONN VRIELING:  So, Your Honor,

9  Premera Blue Cross has issued 1099 forms every year to us and to

10  the -- and to the Internal Revenue Service.  And those are in

11  the Internal Revenue Service's files.  We can -- we've done

12  Freedom of Information Acts.

13          THE COURT:  Just a minute.  That's not what she

14  testified about.  She just testified about these checks.  We can

15  get into that when the jury has left if you want to.

16          DEFENDANT PATRICIA DIONN VRIELING:  It seems really

17  relevant to the whole case.

18          THE COURT:  Well, it's not a question.

19          DEFENDANT PATRICIA DIONN VRIELING:  All right.

20          THE COURT:  It's just a -- it's a statement to me.

21  And --

22          DEFENDANT PATRICIA DIONN VRIELING:  All right.  So I

23  would -- I would rest on the fact that she is giving the same

24  amounts as have already been put into the file.

25          THE COURT:  All right.  Thank you.

1   Anything else?

2        MR. JACOBS:  No, Your Honor.

3        THE COURT:  Okay.  You're excused.

4   (End of requested proceedings.)

1                    C E R T I F I C A T E

2

3          I, DEBRA KINNEY CLARK, do hereby certify:

4          That I am an Official Court Reporter for the United

5  States District Court at the Eastern District of Washington;

6          That the foregoing proceedings were taken on the date

7  and at the time and place as shown on the first page hereto; and

8          That the foregoing proceedings are a full, true and

9  accurate transcription of the requested proceedings, duly

10 transcribed by me or under my direction.

11         I do further certify that I am not a relative of,

12 employee of, or counsel for any of said parties, or otherwise

13 interested in the event of said proceedings.

14         DATED this 4th day of October, 2012.

15

16

17

18                              /s/Debra Kinney Clark

19                              Official Court Reporter
                                United States District Court
20                              Eastern District of Washington

21

22

23

24

25